LAKE MICHIGAN & L. S. TRANSP. CO. v. UNION TOWING & WRECKING CO. et al.

(Circuit Court of Appeals, Eighth Circuit.   November 25, 1901.)

No. 1,503.

COLLISION—TUGS AND TOWS PASSING AT DRAWBRIDGE—FAILURE OF TOW TO OBEY SIGNAL FROM TUG.

> The tug Mystic, towing a raft down stream in the St. Louis river at Duluth, approached the draw of a bridge, while the tug Industry was approaching from the other side, towing the steamer Peerless. There were two channels through the draw, and the tugs agreed by signal that the Mystic should pass through the south channel and the Industry the north channel. It was necessary for the Mystic to push her raft south of the channel, where it would float under the bridge; and in doing so she backed into the north channel to obtain headway, intending to immediately go forward again, and to be out of the way before the Industry, which was about 700 feet distant, should reach the draw, which she in fact was. The master of the Industry, seeing the maneuver, signaled the Peerless to back, which she did; but, when the Mystic began to move ahead, he signaled the Peerless to stop backing, which signal she did not obey, but kept backing until the tug had towed her nearly 500 feet beyond the draw, when her bow came in collision with a barge, which was being towed down to the draw by a third tug, and she was sunk. The testimony tended to show that her continued backing while the tug was going forward threw her bow to one side of the course of the tug, and that otherwise the collision would not have occurred. *Held,* that the action of the Mystic could not be considered the proximate cause of the collision, which must be attributed solely to the fault of the Peerless in failing to obey the signal of her tug to stop backing.[1]

Appeal from the District Court of the United States for the District of Minnesota.

[1] Signals of meeting vessels, see note to Union S. S. Co. v. Erie & W. Transp. Co., 30 C. C. A. 630.

Charles E. Kremer (Howard T. Abbott, on the brief), for appellant.

H. R. Spencer (H. A. Kelley, F. E. Searle, and H. D. Goulder, on the brief), for appellee Union Towing & Wrecking Company.

John H. Norton (A. A. Harris, on the brief), for appellee Stevens.

Before SANBORN and THAYER, Circuit Judges, and ADAMS, District Judge.

THAYER, Circuit Judge. This is an admiralty case, growing out of a collision in the harbor of Duluth, Minn., on September 7, 1899. The Union Towing & Wrecking Company, one of the appellees, was the owner of two tugs, the Industry and the Buffalo. On the day of the collision the tug Industry was towing the steamer Peerless, which belonged to the Lake Michigan & Lake Superior Transportation Company, the libelant and appellant, up the St. Louis river and was approaching the draw of the Northern Pacific railroad bridge, which spans the river. At the same time the tug Buffalo was towing the barge Stewart, which was laden with lumber, down the river, and was approaching the draw of the same bridge, through which it was necessary to pass on its downward course. The tug Mystic, which belonged to Darwin E. Stevens, the other appellee, was at the same time towing a raft down the river, and was nearer to the bridge than either of the other tugs. The latter tug found it necessary to push the raft which it was towing, or to place it in such a position that it would float under the bridge through a passageway for rafts that was immediately south of the south channel of the draw. Signals were exchanged between the Industry and the Mystic, which indicated that the former tug, with the Peerless in tow, would pass through the north channel of the draw. Before the passage was made, however, the tug Mystic dropped her tow, and backed into or across the north channel of the draw, with a view of immediately going forward and crowding the raft which it had in charge further over to the south side of the river, so that it would pass under the bridge through the passageway for rafts, and not block the south channel of the draw. This maneuver on the part of the Mystic seems to have created some confusion, particularly aboard the steamer Peerless as well as aboard the Industry. It also led to some uncertainty in their movements; the result of such confusion and uncertainty being that, when the Peerless had passed through the draw, she collided with the barge Stewart, which was coming down the stream and intending to pass through the north channel of the draw. The Peerless received a blow just behind the stem on the port bow, which compelled her to run into shallow water immediately, where she sunk. The owner of the tugs Industry and Buffalo, as well as the owner of the Peerless, claimed that the collision was due principally to the action of the Mystic in backing into the north channel of the draw at the time it did. The owner of the Mystic claimed that the collision was due principally to the fault of the Peerless. He also charged certain derelictions of duty on the part of the tugs Industry and Buffalo. It will appear, therefore, that the principal question in

the case is whether the master of the Mystic was guilty of negligence in backing across the north channel, and whether such act was the efficient or proximate cause of the disaster. The answer to this question depends mainly on conclusions of fact to be deduced from the testimony, which we shall proceed to state with as much brevity as the case will permit.

The testimony warrants the conclusion, we think, that the Mystic backed her full length into the north channel of the draw, and possibly continued to back until her stem was as much as 10 feet north of the supporting abutment of the draw, doing so as the tug Industry, with the Peerless in tow, was approaching, and not far distant from, the east mouth of the north channel of the draw. The distance to which she backed is probably exaggerated by some of the witnesses; but that she lay at one time across the course of the Industry to some extent can scarcely be doubted, in view of the fact that the master of the tug Industry signaled to the Peerless to back, and she did do so. At the time the Mystic backed into the north channel we conclude that she was about 700 feet distant from, or ahead of, the Industry. The captain of the latter tug says that she was 500 feet in advance of the Industry at the time she lay with her whole length across the channel; but, as the latter witness was interested in making the distance as little as possible, his estimate is probably an underestimate, rather than an overestimate. The Mystic, however, in thus backing across the channel, did so merely for the purpose of immediately going forward and gaining headway to push the raft out of the south channel of the draw, as it was necessary to do; and as the north channel into which the tug backed was 200 feet wide, and as only a portion of the channel was obstructed, the master of the Mystic probably thought that he could easily get out of the way without delaying the passage of the Industry. Subsequent events showed that he was right in that opinion, since the testimony satisfies us that when the Industry passed the Mystic she was 50 or 60 feet distant from the stern of the latter tug, thus showing that the Mystic was well out of her way. Besides, it appears that after the Industry and Mystic had exchanged passing signals, the Industry and Peerless increased their speed somewhat, thus bringing them to the east mouth or entrance of the draw sooner than the master of the Mystic had reason to anticipate.

As respects the conduct of the master of the Peerless, we find the facts to be substantially as follows: Very shortly after the master of the tug Industry signaled the Peerless to back, he discovered that the Mystic was well out of the way, or would soon be out of the way, and that there was no further need of backing, whereupon he signaled the Peerless to stop backing, which order the master and pilot of the Peerless failed to obey. The captain of the tug Industry, who had, perhaps, better opportunity for observation than any one else, and was familiar with the harbor and distances, and best able to decide what ought to be done, and who also testifies with apparent frankness, says that he gave the signal to stop backing as the pilot house of his tug was abreast the pier on which the draw rested,—that is, at the center of the bridge; that the Mystic was then out of the way,

or in such a position as not to obstruct the north channel; that the barge Stewart was at the time as much as 900 feet upstream, and intended on her downward course to pass on the starboard side of the Industry and Peerless, as he (the master of the Industry) well understood, because the barge was in the north channel, and would naturally pass on that side; that the persons in charge of the Peerless disregarded his order to stop backing, although the Industry was pulling forward with her usual speed; that the Peerless continued to back until the collision took place, which occurred about 475 feet above the center of the bridge; and that, as the result of the backing and the slight current, the bow of the Peerless was drawn obliquely over to starboard, so that she was struck by the stem of the Stewart on her port bow, about 2 feet aft of her stem. This witness says with great positiveness, and we find no sufficient reason in the testimony to doubt the verity of his judgment, that if the master of the Peerless had obeyed his order to stop backing when it was given, or with reasonable promptness, he could have pulled the steamer so far over to the south side of the north channel that she would have passed the Stewart in safety.

As a conclusion of law based on these findings, we are of opinion that the master of the tug Mystic was not guilty of any such negligence as renders that tug liable for the collision and consequent sinking of the Peerless. The situation was somewhat unusual, in that three tugs with their respective tows approached the bridge at about the same time. The tug with the raft in tow was moving downstream, which rendered the raft less manageable. The wind appears to have been blowing with some force from the south or southwest, which had a tendency to drift the raft away from the south bank. The raft had no right to pass through the south channel of the draw, and the tug could not pass under the bridge through the passageway that had been provided for rafts. It was necessary, therefore, to drop the tow temporarily and push the raft somewhat to the south, so that it would float under the bridge. This necessitated backing to some extent into the north channel, or across the intended course of the Peerless. The master of the Mystic thought that he had enough time to execute this maneuver without interfering with the passage of the other tugs and their tows through the north channel of the draw, and in this opinion he was right. The captain of the Peerless, who was more accustomed to navigation on the open lake, and was not as well qualified to deal with the situation as the captains of the tugs, seems to have been needlessly alarmed by the temporary appearance of the Mystic in the north channel. He was guilty of an error of judgment in not obeying the signal to stop backing, as he ought to have done; and this probably led to the misadventure, and should be esteemed the proximate cause of the collision, rather than the act of the Mystic.

This, as we infer, is the conclusion that was reached by the trial judge, and in that view we feel constrained to concur. It is accordingly ordered that the decree below be affirmed.